# HYER vs. LITTLE.

1. Where the bill prays an answer without oath, the answer, though sworn to, is no evidence for defendant, though any facts admitted are conclusive against him.

2. Mere opinion, unsustained by any facts, is not sufficient to show mental incapacity.

3. In bargaining for his interest in land with an illiterate and ignorant man, without knowledge of the situation or value of the property, or the nature of the rights of other claimants, strict good faith should be observed by the party so bargaining, not to deceive him by any act or representation, or to allow him to deceive himself by any mistake as to facts, when he knew he was acting under such mistake and had it in his power to undeceive him.

4. In a suit to set aside a deed made by a person unable to read, for misrepresentation as to its contents, and its purport and effect, the burden of proof is upon the defendant; and in such case, it is a part of the necessary proof of the execution of the deed to show that it was read, or its contents made known to the grantor; but an acknowledgement according to the statute, before an officer designated by law, is equivalent to proof that the grantor had knowledge of the contents, if it contains the certificate that the officer made known the contents before the acknowledgment.

5. The evidence held not to sustain the charge of fraud and misrepresentation.

*Quare.* Whether a deed could be set aside for want of consideration, in a suit where it is not set up as a ground of relief.

6. Where one executes and delivers a deed upon terms before offered, but not positively accepted, it is an acceptance of the terms.

7. Such deed will not be declared void on the ground that the terms were hard and unconscionable, especially where it is difficult to say whether they really were so. It is not like a suit for the specific performance of an unconscionable bargain, which the court will, in its discretion, refuse to decree.

8. Courts of equity never declare deeds void for mere inadequacy of consideration, unless the inadequacy be so gross as to be of itself a convincing proof of fraud or imposition.

9. Services requiring skill, sagacity, and judgment cannot be measured by any fixed scale, and where their value has been agreed upon and fixed by the parties, cannot be reviewed or changed by courts.

The hearing of this cause was brought on, upon the pleadings and proofs, for final decree.

*Mr. A. V. Schenck* and *Mr. C. Parker*, for complainant.

*Mr. McCarter*, for defendant.

THE CHANCELLOR.

The object of the suit is to have a deed, given by the complainant to the defendant, declared void. The ground on which this relief is asked, is fraud in the defendant. The fraud charged consists, first, in falsely stating to the complainant the contents of the paper which he executed, which was not read to him, he being unable to read; secondly, in misrepresenting the extent and value of the property conveyed, and the extent of the complainant's interest therein.

The bill alleges that the defendant told him, that it was a small tract of land of little value, not producing enough to pay the taxes, and that the complainant had a small interest therein, as one of many heirs, which might not be worth over $50, when in fact the tract was a farm of one hundred and sixty acres, in South Amboy, worth $10,000, and the complainant was the only heir of the person who died last seized, which facts were known to the defendant, who also knew that the complainant was ignorant of them, except so far as he gave information; that the defendant told him that the paper which he executed was a power of attorney, to enable the defendant to get for him his share in the property, for which purpose the defendant said he had been employed by the other heirs, but in fact it was a deed conveying the whole farm in fee, for the nominal consideration of $100, no part of which was paid. The only ground on which relief is asked, and the only matter set out in the bill on which relief can be granted, are these matters of misrepresentation and concealment.

These facts, or either branch of them, if proved, are

abundantly sufficient to entitle the complainant to the relief asked for. The main questions in the case are, as to the truth of the facts; these must be ascertained by the evidence alone. The bill prays that the defendant may answer without oath, and, therefore, his answer, although sworn to, is no evidence for him, though any facts admitted in it are conclusive against him. The defendant, in his answer and in his testimony, denies the fraud, misrepresentation, and concealment, both as to the facts and the contents of the paper.

The main facts of the case, as admitted or proved beyond controversy, are these: William Bennett, called the first, died about the 1st of October, 1790, seized of the farm conveyed by the deed in question. By his will, dated September 16th, and proved October 11th, 1790, he devised this farm in fee to his son William Bennett, the second, then an infant, and not four years of age. He was proved to be between seventy-five and eighty at his death, in 1866. William Bennett, the second, was an idiot, and died without ever having been married, and intestate; he was the only child of his father. William Bennett, the elder, had two brothers, Hendrick and Jacob, and one sister, Agnes, wife of Walter Hyer. Both these brothers had children; but how many, what was their ages, or where they lived, and whether now living or dead, does not appear. William Bennett, the first, by his will, directed that if his son should die under twenty-one, one half of his estate should go to his brother Hendrick's son, William, one fourth to his brother Jacob's son, William, and one fourth to Walter Hyer's son, William, showing that each had one son in 1790. The complainant, Cornelius Hyer, is a son of Agnes Hyer. She had a number of children, all of whom died before William Bennett, the second, except the complainant, and one son named Charles, who had moved away and has not been heard of for thirty years, and is supposed to be dead, but nothing is known of his death, by hearsay or otherwise. The complainant had removed from the state shortly after 1812, and had not

been heard of by his relatives in the state, nor had he heard from them in many years; he was supposed to be dead. Shortly after the death of William Bennett, the second, some of the descendants of Agnes Hyer, the nephews and nieces of the complainant, supposing that all the children of Agnes Hyer were dead, claimed the property as heirs of William Bennett, the second. The claimants were numerous, and for the most part ignorant and poor. Other parties undertook to buy their claims. J. Biddle Herbert bought the claims of parties, who claimed to own fourteen nineteenths of the whole; these were conveyed to him. Joseph Imlay bought a number of these supposed rights, which were conveyed to him.

In February, 1867, J. Biddle Herbert applied to a justice of the Supreme Court for a partition, and on that application a sale was ordered; the property sold for $10,700; the sale was confirmed by the Supreme Court at the Term of June, and the deeds were to be delivered on the 6th of July, 1867. Imlay had employed the defendant as his counsel in this affair, and had agreed to pay him for his services one half of the net profits that he should realize. On Saturday, the 29th of June, Imlay had learned from some relation of the Hyers, whom he accidentally met, that the complainant had been alive a few years before, and received some information as to his residence in the interior of the state of New York. He communicated this to the defendant, and both thought that his claim, if living, would be superior to that of Herbert or Imlay, and agreed that it was important that this should be ascertained before the delivery of the deed on July 6th. The defendant was also counsel for some of the purchasers. The defendant started on Monday, July 1st, to find the complainant. He found his wife near Utica, and learned from her that her husband had for years lived apart from her, and was near Sunbury, in the state of Pennsylvania. He procured her to sign and acknowledge the deed which he had prepared, and which the complainant afterwards executed. He arrived at Sunbury on the morning of July 4th;

was directed to the house of John Ryan, the complainant's son-in-law, with whom he lived; on the way he asked for direction of a man mowing in a field, who was John Ryan, and who directed him to his house, where the complainant lived. He found the complainant, told him his business; told him that he was an heir to some interest in this property, of which William Bennett died seized, and that he wanted him to go to Sunbury to execute a paper so that he could settle complainant's right. Mrs. Ryan was present part of the time. Complainant got into the buggy and went to Sunbury with the defendant, and while there executed the deed in presence of A. Jordan, president judge of the district court, before whom he acknowledged the execution; the judge certifying in the usual form that he first made known the contents to the complainant. The defendant left the complainant at the depot, at Sunbury, at forty minutes past ten, on July 4th, taking the train by which he returned home on the evening of the 5th, so as to prevent the payment by the purchaser at the commissioners' sale, which was to have been made on July 6th, at ten A. M. He was with the complainant only two hours in the whole, and the necessity of his returning was urged as the reason why he could not delay. He gave notice to the commissioners not to deliver the deed, stating that he had a deed from Cornelius Hyer, the son of Agnes Hyer, who was still living, and in whom he believed the title was. The complainant and his son-in-law, Ryan, became dissatisfied and suspicious about the transaction, and came on to the neighborhood of the property, but did not see the defendant. They afterwards met; negotiations were had, but no settlement was effected. The complainant came in contact with John W. Herbert, a cousin of J. Biddle Herbert, who went out to see him at Sunbury, and made an agreement with him, that he, J. W. Herbert, should proceed to recover the property for complainant; Herbert to receive one third of the proceeds recovered, and to pay one third of the expenses, the complainant to receive two thirds, and to

pay two thirds of the expenses; under that agreement this suit is commenced in the name of the complainant.

The defendant contends that the deed to him was given upon the agreement that he should proceed and recover the property, or the right of the complainant in it, and that he should pay to the complainant one half of the net proceeds above expenses. And he further contends, that he made no misrepresentations to the complainant, either as to the property or his interest in it, and that the complainant fully understood the contents of the deed, and the effect and object of it. The contest is as to these facts.

The defendant stood in no fiduciary relation to the complainant; he was a counselor-at-law, but he was not, in any way, either the counsel of the complainant or his attorney in this matter. Neither party so understood it, nor is it claimed by the complainant that such relation existed. He presented himself as an agent, looking up the title to this estate, and as having agreed with others to take their claims, and to pay them one half of what he recovered. He presented himself as a purchaser, on speculation, of the rights in this farm, and the parties were dealing on equal terms.

Nor was the complainant of weak or disordered intellect, such as to affect the bargain. No such fact is set up in the bill as the ground of relief; but, if it had been, there is no proof to sustain the allegation. He was, it is true, seventy-six years old. Although some persons are, at that age, of impaired intellect, yet very many have their full vigor of mind past that age. We all know many illustrious examples, in our own day, of statesmen, chancellors, and judges who maintained their full vigor of intellect, and performed laborious duties requiring such vigor, at, and much beyond that age.

The only evidence to sustain want of capacity is that of the three Ryans, and of Mrs. Ryan. This evidence is mere opinion, sustained by no facts. Their own statements show that their opinions are based upon the fact that the complainant had nothing to do, more than upon his incapacity

Hyer *v.* Little.

for doing it. He had physical vigor; he walked sometimes two miles to Sunbury and back, and did it at eleven o'clock at night. He was allowed by his daughter and her husband to go alone to Sunbury with Little, to arrange this business, when they knew that the object was to execute some writing relating to his newly discovered inheritance. Had his mind been impaired so as to unfit him for business, they would not have permitted this. His own examination in this cause shows memory and intelligence, and is of itself sufficient to outweigh any evidence on that head in this cause.

Nor do I think, as was zealously contended by the counsel of the complainant, that the defendant, because he was a counselor-at-law, was bound, in a case where his profession was not concerned, by a higher and different code of law, or even morals, than that which governs other citizens; that he was bound to lay completely before the complainant, and to impress upon him every view that could be taken of his rights, in the strongest manner. No other man, in selling stock, is bound at law, or feels himself bound in morals, to proclaim to the purchaser every unfavorable fact which he has heard as to the prosperity of the corporation whose stock he offers. A counselor-at-law is not bound by any other rule. However desirable it may be, the profession has never yet been placed upon so high a pedestal, elevated above all other avocations.

But, on the other hand, he was dealing with an illiterate and ignorant man, who did not know the situation or value of the property, or the nature of the rights of other claimants. Little knew even more about his own family and relations than he did himself. In this situation, in dealing with this complainant, he was bound to observe strict good faith, not to deceive him by any act or representation of his own, or to allow him to deceive himself by any mistake as to facts, when he knew he was acting under such mistake, and had it in his power to undeceive him.

The first question is as to the misrepresentation of the contents of the deed, and of its purport and effect. On

2 P*

this issue the burden of proof is upon the defendant; the complainant is not able to read, and in such case it is a part of the necessary proof of the execution of a deed, that it should be shown it was read, or the contents made known to him. The mere proof of making a cross or mark at the end of a deed by a witness who saw it made, but did not know whether the marksman was informed of the contents of the deed, would not be sufficient to give effect to the paper as the deed of the marksman. But this deed has been acknowledged by the complainant as his deed, before such officer as is designated by law for that purpose, and this acknowledgment is equivalent to proof that all the requisites of execution have been complied with; this includes knowledge of the contents, as well as signing and sealing. Even before the act of 1820, requiring the officer to make known the contents, and to certify that he had done so, the acknowledgment would have been *prima facie* proof of this. Since that act the certificate of the officer that he first made known the contents, which is not only authorized but required by law, is plenary evidence of such fact. It is not conclusive evidence; it may be rebutted and shown to be untrue. In this case the deed of the defendant has in it such certificate. That certificate is signed by a high judicial officer of Pennsylvania, the presiding judge of the eighth judicial district, an officer who would not probably certify that he had just done an act which he had not done; the certificate is in his own handwriting, and more than all, the certifying that he first made known the contents is interlined or added in his own handwriting to the certificate after it was signed; this is evident from inspection of the paper, as well as the testimony of the defendant. The judge could not have mistaken the nature of the paper. Both on the back and upon the front of the document, the words quit claim deed are conspicuously printed; on the back, about one inch from his signature and seal. It is not to be presumed that such an officer would willfully certify to a falsehood, or would have performed a duty, to which his attention was thus called, in a careless or

insufficient way, such as to be of no use to the grantor, or that he would have represented, or allowed it to be represented to the grantor, that this deed was a mere power of attorney. This inference will be strengthened, if the account of the discussion of this matter between the judge and himself, testified to by the defendant, is believed. By this acknowledgment then, the burden of proof is thrown from the defendant to the complainant, and these attending circumstances throw it upon him with a weight to be overcome much greater than the mere technical shifting of the *onus probandi*. In this situation of the matter the only witnesses as to the fact are the complainant and defendant, each equally interested, each equally credible; if they thus neutralize each other, the certificate must decide the question for the defendant. Besides this, these two witnesses stand in a different position from this fact, that the defendant, from his profession and intelligence, fully understood the nature and effect of this paper, and the difference between it and a mere power of attorney, and could not testify as he does, without willful perjury, if he represented this as a power of attorney. The complainant might possibly confound the object for which the defendant said he wanted the deed, that is, to give him power to convey and settle up the property and receive the money, with the character of the paper, and to testify to such impression without intending to falsify. And beyond this, these witnesses disagree as to the fact whether there was any conversation between the judge and the defendant as to the necessity of the certificate of making known the contents. The fact of the addition in the manner it is made, strongly, almost conclusively confirms the statement of the defendant that he mentioned it to the judge. This leads necessarily to the conviction that the defendant is more to be relied on for accuracy or truthfulness, than the complainant. I feel constrained to hold that the allegation of the bill, that the contents of the deed were not correctly made known to the complainant, relied upon as a ground for setting it aside, is not sustained by proof.

The other branch of the fraud as to misrepresentations of the interest of the complainant in the property, and the value of that interest is charged in the bill in these words, that the defendant "represented to your orator that the said Bennett died without a will, leaving certain lands in the county of Middlesex, in the state of New Jersey; that there were a large number of persons interested in said lands and estate; that he, the said Little, had been appointed by a number of the heirs of said William Bennett to trace the matter out, and settle up the said estate; and that the interest of your orator in the whole matter would be very small, and that your orator's interest in the whole of said lands or estate would not exceed from $50 to $100;" and again, "that after the execution of the said paper by your orator, and on the same day, he, the said Little, again represented to your orator that the interest of your orator in said lands was very small, but inasmuch as your orator was poor, he, the said Little, would venture to advance your orator $100, although he did not think that the interest of your orator in said lands was worth that sum."

The only witness to these representations beside the parties is Mrs. Ryan, the complainant's daughter, who was present at part of the interview, when Little first met Hyer. According to her, Little told Hyer, "that a small property had been left to him on his mother's side of the house, and that he would have a small interest in this property." "Mr. Little did not say anything about the size and value of the farm; he said it was a small property in which father would have a small interest; he said it was not worth much if anything; that it was growed up, and they did not raise enough to pay the taxes." "That there might be $50 coming to father, and there might not be so much—he could not tell." "He said he wanted it to be settled up; this bit of property that he was an heir to, or partly an heir to, with the rest. He said his brothers and sisters were all dead except Charles, and he could not tell about him." "My father told Little that he did not know whether his brothers and sisters were

living or dead." If this statement is true, and Little made no more full or other statements to Hyer about the property before he executed the deed, it would go far to sustaining the charge of misrepresentation. Although some of the terms are vague, as "small property" and "small interest," yet when addressed to a man in Hyer's known circumstances, their meaning cannot be mistaken, and they did not state the truth with regard to his interest in this property. But these statements are contradicted by Little, and the statements made by him to Hyer after this interview and before the execution of the deed, were such as to make these of little consequence.

To these subsequent statements the only witnesses are Hyer and Little, and they agree as to the substantial and important parts. Little testifies that when he first met Hyer, "I told him that he had an interest in some lands in New Jersey, and that interest depended on the number of heirs there were living; that the Warne's claimed it, but I believed it belonged to the Bennett's." "I had a memorandum about the members of the family; about his mother Agnes, Hendrick Bennet, and Jacob Bennett; he said he knew nothing about the families of Hendrick or Jacob, nor did he know about his own family, that is, Agnes' children, except Charles, and he did not know whether he was living or dead." "Before we started I told him that his interest in this land was very uncertain; that I did not know what it was; that it depended upon the number of first cousins who were living, and that it also depended upon the Warne interest." "I did not name any sum as the probable value of his interest." "I stated to him that I hoped his interest was large enough to make him comfortable during the rest of his life, him and his wife, but I could not tell about that until I had prosecuted the inquiries elsewhere as to how many of the families of Hendrick Bennett and Jacob Bennett were living, and of his own family, Agnes Hyer; that it might be much or little; at the house I told him it was a farm of some one hundred and fifty or one hundred and

sixty acres." "On our way to Sunbury, Hyer wanted to know what I would give him for his interest. I told him I did not want to buy it;" "that I would not then give him $100 for it, that in my opinion it was worth a great deal more, and that I thought I might get enough out of it to make him comfortable for his life, and probably he would leave something behind for his children." "I think I told him that the property had been sold for upwards of $10,-000, but the exact sum I did not know although I was at the sale, and told him the number of acres mentioned in the deed."

On these points the complainant in his examination testifies: "I told Mr. Little that I did not know whether Charles was dead or alive, I had not heard from him in thirty years; Mr. Little asked me about my uncles, Jacob and Hendrick Bennett and their children, whether I knew anything about them; I told him I did not." "Mr. Little told me that my interest depended upon the number of children who were living of Jacob Bennett, Hendrick Bennett, and of my mother." "He told me that the property had been sold by the executors, or by somebody who had something to do with it." "He told me that he did not know, and that it was impossible for him to say what my interest was; that he hoped I would get enough out of it to make me comfortable for the rest of my life. I do not remember whether he told me that it was better for me to take my share than to sell out my right; he told me that it had been sold by commissioners, and that the deed was to be delivered on Saturday next; he said he expected he would have to law, and that it would be necessary to hunt up the family to ascertain who were living; I told him I had no means myself; I could not do it." "Mr. Little said I had an interest in a small farm in New Jersey; did not exactly say how many acres, about one hundred and fifty acres, I understood Mr. Little; he did not say how much it sold for, nor did I ask."

There can be no doubt from the evidence of both these witnesses that Hyer understood that the commissioners' sale

was made through claims under title of second cousins of William Bennett the second, and that these claims and this sale were made void and of no account, by the fact that he, a first cousin, was living.

Then, as to his interest, both he and Little expressly state that Little distinctly told him that his share depended upon the number of the children of Hendrick, Jacob, and Agnes, or of first cousins of William the second, who were then living. This proposition is true, and Hyer distinctly understood it. As to Charles, he did not know whether he was living or dead; both no doubt supposed that he was dead, but neither said so. He had not been heard of for thirty years, and before that, was said to be consumptive. Of the children of Hendrick or Jacob, Hyer knew nothing, and Little seems to have known nothing; it no where in the case appears, that he or any one else knew or now knows anything about them. It was known that one child of each was living in September, 1790; they were mentioned in the will of William Bennett the elder. The complainant was then about a year old; these children may have been of the same age. William Bennett, the second, was about the same age; and it was just as probable that these two children of Jacob and Hendrick should have survived William Bennett, as that the complainant should, and just as probable that they should be found living, although not heard of for many years, as that the complainant, after an absence of fifty-five years for the greater part of the time unheard from, should be found alive. It was possible, perhaps I may say probable, that both Jacob and Hendrick had other children younger than these, younger by fifteen or twenty years; such, at the death of William the second, would not have been over fifty-six or sixty-six years old, and their surviving him, therefore, not improbable. Now, unless it is shown that these children were all dead, and that the fact was known to Little at the time, or that he had good reason to believe that it was so, his representation was strictly true and honest, and there was no fraud or want of good faith in his making it.

And the fact that the titles of second cousins which he and his associate, Imlay, had been purchasing, were rendered worthless by the discovery of Cornelius Hyer, who was probably dead, or ought to have been presumed to be dead, would just at that time have made these possibilities seem to him of importance, and naturally induce him to present them to the complainant; he expressed no opinion as to the probability of such other cousins being in existence. And in this stage of the cause with all the evidence produced by both sides, nothing is known by which the conclusion can be reached with any certainty, that all the children of Jacob Bennett and Hendrick Bennett are dead, or even that Charles Hyer is dead. It is highly probable that Charles is dead; he was about seven years older than the complainant. But many persons live beyond the age of eighty-four, even those of apparently feeble constitution. It is rather probable that the children of Jacob and Hendrick are all dead, but the presumption is not a violent one. Under this state of facts, no prudent counsel would to-day advise a client to take the title of the complainant, and pay full value for it. If three other cousins should have been living in 1866, the complainant's share would be reduced to one fourth.

Next, as to the value. Hyer admits that Little told him the farm contained one hundred and fifty acres. Little says he told him one hundred and fifty or one hundred and sixty; the deed, which was read to him, states one hundred and sixty acres; so that there was no design to conceal or misstate that. Little says he thinks he told him that the farm had been sold for over $10,000. Hyer states that Little told him that the farm had been sold by commissioners, but did not state the price, nor did he ask him. At all events, Little did not conceal the sale, nor did he conceal or misrepresent the price. Both admit that he told Hyer that he was in hopes to realize for Hyer's share enough to make him comfortable for life; Little says to make him and his wife comfortable, and to leave something to his children. This is a far different representation from the pretence that

Little said it was not worth $50 or $100. In fact, it is not far from what may be realized from the half of Hyer, if he proved to be the sole owner. It would require from $4000 to $5000 to yield a comfortable support to Hyer and his wife. He certainly and clearly advised the complainant, according to his own statement, that his interest in this farm was, in the opinion of the defendant, of considerable value, far, very far, above the sums of $50 or $100, which he is charged with stating to be the value. Under no aspect of the case could it be considered a fraud in Little, under the relations existing between him and Hyer, not to have mentioned the price at the commissioners' sale, after he had told him of that sale, and given him the temptation as well as the opportunity to ask the price.

Under this view of the evidence, I cannot arrive at the conclusion that Little practiced any fraud or deception on Hyer, in any statement of his interest in this property, or of the facts on which the extent of his interest depended, or of the extent or value of the property. He stated to him what was the truth, that he, or rather Imlay, had purchased the rights of others, supposed to be heirs, on the like terms. The share, one half of the proceeds of the farm, will be large, excessively large, if Hyer proves to be the sole heir and owner of the whole tract; but this excess constitutes no fraud. From the facts before the court, it is by no means clear that Hyer owns the whole or even one half of this tract, and in case he should only own one fourth, the charge could be hardly considered excessive, much less fraudulent.

The charges of fraud in representation as to the interest of the complainant and the value of the property, are, therefore, not sustained, so as to entitle the complainant to the relief sought on those grounds.

This case differs very much from the case of *Reynell* v. *Sprye*, cited for the complainant, and much relied on by counsel. That case is most fully reported in 13 *Eng. Law and Eq. Rep.* 74, but it will be found in 8 *Hare* 262 and 1 *DeGex, McN. & G.* 660. In that case, the interest of

Reynell was not doubtful or precarious, and that fact was known to Sprye, and after he knew it, he represented to Reynell that it was doubtful; and he falsely represented to him that it was the practice among men of business, when the title was precarious, to give one half the value to the party giving them information of the title and conducting proceedings to recover the property. By these representations Reynell was induced to convey to Sprye one half of an estate worth £1200, or $6000, per annum, the title to which was clear beyond question. The court set aside the conveyance, and expressly placed the decision on the ground that the representations as to both matters were false, and that Sprye knew them to be so. Here the representations on both these points are true.

But it is urged that this deed should be set aside for want of consideration; but if it could be set aside on that ground in this suit where it is not set up as a ground of relief, yet it is not shown to be true. No money was paid at the time, but the defendant agreed to establish the complainant's title and settle the estate, and give him one half of the net proceeds. Little testifies positively that such was the bargain. Hyer denies that he made such bargain. He says, after he told Little that he had no means to establish his title : " I did not ask him on what terms he would do it; he proposed to give me one half of what was realized after expenses were paid, but I did not agree to it; I did not say that I would not, nor that I would; I made no answer to it. This conversation was on the way to Sunbury. I went right down to Sunbury and executed the paper." These facts constitute an agreement. When one executes and delivers a deed upon terms before offered, but not positively accepted, it is an acceptance of the terms.

It is alleged that the terms of this agreement are so unconscionable and exorbitant, that a court of equity must declare it void, that it would not decree its execution, or allow it to be set up as a defence. This is not a case of specific performance, which being in the discretion of the court, will

not be decreed of a hard or unconscionable bargain. The defendant has the title, and the complainant seeks to set it aside. A promise is a sufficient consideration for a deed; it may be by bond or promissory note, or by parol; all can be enforced at law; it may be for money, or services, or at a day certain or on a contingency. The bargain alleged in this case is not a trust, but simply to perform services and to pay money, and is a sufficient consideration to sustain a deed. Courts of equity never declare deeds void for mere inadequacy of consideration, unless the inadequacy be so gross as to be of itself a convincing proof of fraud or imposition. Under the circumstances on which this case is placed, it is very difficult to say whether this agreement is excessive and exorbitant on the part of Little. The efforts, energy, and sagacity of Little and Imlay discovered the title of Hyer. Little traced and found him, with energy that few men would have exhibited, and without which Hyer would have probably gone to his grave without learning of his inheritance. Hyer had neither money nor sagacity to establish his title, and realize any benefit from the property; he was supported by and under the control of a son-in-law, who could and would control him, and has controlled him in such a way that he will likely never reap any personal advantage from his inheritance. It was a gain at least of independence to him, to be able to assert his claim to this property, by paying the expenses out of the property instead of calling upon Ryan. And on the other side, this suit is perhaps but one out of a number which Little may have to struggle with before he realizes any proceeds. He may only recover a third or fourth of the whole. His energy and sagacity shown in his discovering Hyer among the mountains of Pennsylvania would be useful in tracing out the other branches of the Bennett family. Added to this the influence upon purchasers, which his representations as to the result of his researches might have from his position, intelligence, and character, was of great importance to Hyer, and these advantages might have been worth more to him than the share

given to Little. He had also procured the conveyance of Mrs. Hyer's dower right, on his own promise to provide for her, which might be a material matter on a sale. I am not willing to say that under these circumstances the share given to Little is so exorbitant and unconscionable as to imply fraud and set aside the deed. . It does not seem to be so exorbitant and unconsionable as the bargain with Herbert, under which his suit is conducted; by that Hyer is to advance two thirds of the expenses and Herbert to have one third of the proceeds. Hyer was indebted to Little for informing him of his title; an obligation always treated as worthy of consideration. Herbert, on the other hand, seems in some way to have been connected with the adverse claimants, who had attempted to appropriate the property, and takes advantage of the result of Little's labor, sagacity, and outlay, and simply conducts the suits at joint expense.

I am inclined to think on the whole that Hyer's original bargain with Little was a wise one, at least much more so than that since made by or for him. That the energy and ability of Little and Imlay, stimulated by a share sufficient to induce exertion, would have sooner settled the true amount of his interest, and would have secured a quicker and larger realization of benefit than will result from his later arrangement:

It is in fact difficult to determine what is a fair or what an excessive charge for services requiring skill, sagacity, and judgment. Such services are often like the fees of eminent counsel, subject to measurement by no fixed scale, and when the amount has been actually agreed upon and fixed by the parties, cannot be reviewed or changed by courts.

I think that the complainant is not entitled to the relief prayed for.