AUGUSTUS F. EGGERS, executor of Minna Stager, et al., defendants and appellants,

v.

EFFIE B. ANDERSON et al., complainants and respondents.

[Filed June 19th, 1901.]

1. If the whole scope of an arrangement *inter partes* is fulfilled by the mere making of a will, then nothing legally binding on him who signs the testamentary writing is contemplated, and he remains at liberty to change his mind and provide for a different disposition of his property.

Eggers *v.* Anderson.

2. The court of chancery in this state possesses a general jurisdiction in cases of fraud, as well in cases where the remedy at law is plain, adequate and complete, as in other cases; but when the remedy at law is plain, adequate and complete, the court of chancery is reluctant to exercise its jurisdiction, and will not do so unless the administration of justice will thereby evidently be facilitated.

3. The complainants were induced to support the testatrix during several years by her fraudulent pretence that she was destitute, when in fact she had a considerable estate in bank.—*Held,* that the complainants were entitled to be recompensed out of the estate for the money and property so furnished to her, and that, in view of the numerous small items to be considered in ascertaining the compensation due, their bill in equity for such compensation should be sustained.

On appeal from a decree advised by Vice-Chancellor Pitney, whose opinion is reported in *16 Dick. Ch. Rep. 85.*

*Mr. Adrian Riker,* for the appellants.

*Mr. William H. Osborne,* for the respondents.

The opinion of the court was delivered by

DIXON, J.

The complainants, a band of charitable young women styling themselves "The Ever Ready Circle of King's Daughters," began in the year 1892 to assist Mrs. Minna Stager, an old German woman living in apparent destitution, and continued doing so until her death in January, 1900. In the year 1897, something (it does not appear what) led them to suspect that perhaps she was not really destitute, and they asked her to make a will in their favor. She having consented, the husband of one of them, a lawyer, prepared a will bequeathing all her property to the complainants, and in June, 1897, went with several of them to the house of Mrs. Stager, then about seventy-five years of age, and an interview took place which he describes as follows:

"I said to her, 'Mrs, Stager, these young ladies have told me that they have asked you to make a will in their favor in consideration of all that they have done for you, and all that they are doing for you, and all that they expect to do.' I said, 'I want to understand from you whether that is your understanding.' I repeated that twice very clearly. She stated,

Eggers *v.* Anderson.

'That is true.' She said, 'We have talked about this among ourselves several times, and I am more than willing to do this thing for these girls.' She said, 'All the happiness I have had for the last few years they have furnished me, and I am very glad to do this thing for them.' I then produced the will and read it to her carefully twice. She took it herself and read it. It was then executed in the usual way. I kept the custody of the will and gave her a copy."

Not long afterwards the will itself was, at her request, given to her and she tore it up; then, in December, 1897, she executed another will, revoking all former wills and bequeathing her property to her relatives in Germany, and appointing Augustus F. Eggers her executor. This will has been admitted to probate. The revocation of the first will was not made known to the complainants, and they continued, until her death, rendering to Mrs. Stager the same charitable assistance as before, she still holding out the appearance of utter destitution. During the eight years of their ministration they estimate that they spent for her about $600, gathered partly by their own contributions, partly by those of their acquaintances, and partly through entertainments managed by them. At Mrs. Stager's death it was found that in the year 1892 she had in a savings bank about $2,500, to which she added in September, 1892, a deposit of $236, and in February, 1895, one of $150, and she had drawn from the account only three items of semi-annual interest accruing in 1897, 1898, and 1899, amounting to $161.60, so that the balance at her death was about $3,800, and when all charges are paid, her estate will exceed $3,000.

On this state of facts the complainants filed their bill in equity against the executor and legatees under the last will, praying that

"the promise and agreement and will of said Minna Stager in favor of said orators be decreed to be a contract, and irrevocable; and that the same be enforced and the rights of your orators thereunder, or in any manner, in the estate of said Minna Stager, be enforced against said defendants and said estate, and that said defendants and each of them do forthwith account to your orators for all property and estate belonging to said Minna Stager coming into the hands of any and all of them * * * and that it may be clearly ascertained what amount, by reason of the foregoing, is due your orators, and that your orators may be paid such sum or sums so due them."

The answer of the defendants deny in substance that the transactions between their testator and the complainants amounted to a contract, or were such as to entitle the latter to any relief at law or in equity.

Doubtless a person may enter into a legal obligation to make a certain disposition of his property by will. *Johnson* v. *Hubbell, 2 Stock. 332.* Such an obligation does not seem to differ in essence from one concerning the disposition of property by other means. But a will is in its very nature ambulatory, subject to revocation during the life of him who signs it. *1 Jarm. Wills ch. 2; Reid* v. *Shergold, 10 Ves. 370, 379.* Irrevocability would destroy its essence as a will. *Hobson* v. *Blackburn, 1 Ad. Eccl. 278.* Said Lord Penzance in *Goods of Robinson, L. R. 1 P. & D. 383:* "An invariable test when a question is raised as to the testamentary character of a paper, is whether the paper is revocable." This inherent quality is declared by our statute of wills, and cannot be impaired by private contract. *Pacta privata jure publico derogare non possunt* is one of the maxims of the law, as an instance of which Broom cites the revocability of wills. *Lex. Max. 309 (note a)* ; *Vynior's Case, 8 Rep. 162.* If one should, under contract, execute a will and covenant not to change it, and afterwards should revoke it, substituting another, the latter only could be admitted to probate as a will; the other party would obtain redress only by securing, at law or in equity, such remedy for breach of the covenant as the rules of those jurisdictions provide.

From this mutability of wills it follows that if the whole scope of any arrangement is fulfilled by the mere making of a will, then nothing legally binding upon him who signs the instrument is contemplated, the obligatory force of a contract is not intended, and he remains at liberty to change his mind. The claim that a legal obligation is assumed must be supported by something beyond the consent to make a will.

In the arrangement now before us, the words go no further than the making of the will, and we must consider whether the substance fairly imports anything more.

The language in which the lawyer opened the matter to Mrs. Stager seems like a legal formula prepared to introduce a con-

tract, but when applied to the facts, its complexion changes. "In consideration of all that these young ladies have done for you, and all that they are doing for you, and all that they expect to do," is the professional phraseology. But what the complainants had done and were doing for Mrs. Stager was purely charitable, without desire for pecuniary compensation or thought of legal obligation, and what they expected to do was not declared to be of different character. The substantial import was: "You see how kindly disposed these young ladies have been and expect to be towards you; will you not show a like disposition towards them? They have incurred no legal obligation, and they express no purpose to incur any legal obligation for the future, and they ask of you, not that you incur a legal obligation for them, but merely that you execute an instrument, which, if it remain unchanged at your death, will give them all your property, but which in its very nature is changeable at your pleasure as long as you live." This is the request to which Mrs. Stager, with apparent gratitude and gladness, assented. If the design had been to present to the mind of Mrs. Stager a proposal that at all events her property should come to the complainants at her death, would not the lawyer have produced a writing not in its nature alterable as she should choose, and if Mrs. Stager had so understood the proposition, knowing that the mere interest upon her funds in bank exceeded the contributions of charity, and cunning as she evidently was, would she not have refused or at least withheld consent?

I think that under the circumstances the consent to make this will should not be deemed a contract. At the best, it is not certain that the parties meant what they did to amount to a legal obligation, and, as was held by Lord Loughborough in *Walpole* v. *Orford, 3 Ves. 402, 419,* which also was a case to enforce an alleged agreement to make a will, such uncertainty is sufficient to stay the hand of a court of equity.

But there is another basis on which the bill may rest.

The testimony fully supports the allegation of the complainants that their contributions to Mrs. Stager were induced by her fraudulent representations as to her means of living, and the prayer of the bill is sufficient to entitle the complainants to re-

Eggers *v.* Anderson.

lief on that ground, if a court of equity is competent to afford relief. The bill prays (*inter alia*)

"that the rights of your orators * * * in any manner, in the estate of said Minna Stager be enforced against said defendants and said estate, * * * and that it may be clearly ascertained what amount, by reason of all the foregoing, is due your orators, and that your orators may be paid such sum or sums so due them."

That the jurisdiction of the English court of chancery extended to such cases is clear. In *Coll* v. *Woollaston, 2 P. Wms. 154 (1723),* the complainants had been induced by fraudulent representations to pay the defendants £240 for shares in a patented scheme to extract oil from radishes, and brought their bill to be repaid, and a decree was made that the defendants repay the sum, with interest, the master of the rolls saying: "It is no objection that the parties have their remedy at law, and may bring an action for moneys had and received for the plaintiffs' own use; for, in cases of fraud, the court of equity has a concurrent jurisdiction with the common law, matter of fraud being the great subject of relief here." In *Chesterfield* v. *Jansen, 2 Ves. Sr. 125, 155,* Lord Hardwicke said that a court of equity has undoubted jurisdiction to relieve against every species of fraud. In *Evans* v. *Bicknell, 6 Ves. 174,* which was a bill to recover from the defendant money paid by the plaintiff to a third person, in reliance on false representations which the defendant had wrongfully enabled the third person to make, Lord Eldon said: "If there is a jurisdiction at law in such cases, there is also a jurisdiction in equity." And speaking of *Pasley* v. *Freeman, 3 T. R. 51,* the leading case at law, where, in 1789, the king's bench had maintained an action on the case for fraudulent representations regarding the credit of a third person, the lord chancellor said: "It has occurred to me that that case, upon the principles of many decisions in this court, might have been maintained here, for it is a very old head of equity that if a representation is made to another person, going to deal in a matter of interest upon the faith of that representation, the former shall make that representation good, if he knows it to be false." In *Slim* v. *Croucher, 1 De 'G., F. & J. 518,* where

the complainant had suffered loss through a misrepresentation made by the defendant, Lord Campbell, sitting in the court of appeal in chancery, said: "The defence set up in this suit is that there was a remedy at law, and that that is the only remedy competent to the plaintiff. Now, that there was a remedy at law, I think, is quite clear. \* \* \* I am of opinion, however, that this belongs to a class of cases over which courts of law and courts of equity have a common jurisdiction, and in which the procedure of both jurisdictions is adopted for doing justice." Lord-Justice Knight Bruce said: "The only point reasonably arguable was, in which of the courts in this country redress should be sought, and it has been said that redress should be sought in a court of law. It is true that (according to modern practice—a useful and beneficial practice, I believe) a court of law would afford redress in the case by means of an action, with the assistance of a jury, but the courts of law in this country exercise jurisdiction in these cases by means of a gradual extension of their power, an extension which I believe has been useful to society; and we know that that does not deprive the courts of equity of their ancient and undoubted jurisdiction, which they exercised before courts of law had enlarged their limits. The observation is familiar—and some of us have heard it used by Lord Eldon—that the jurisdiction not only belongs to this court, but belonged to it originally." Likewise, Lord-Justice Turner said: "I think that if we were to grant any relief upon this appeal, we should be very much narrowing an old jurisdiction of this court by confining it to cases in which it has been exercised. We should, I think, be taking the cases as the measure of the jurisdiction, instead of the examples of that jurisdiction." In *Blair* v. *Bromley, 5 Hare 542; S. C., 2 Phil. 354; Ramshire* v. *Bolton, L. R. 8 Eq. 294,* and *Hill* v. *Lane, L. R. 11 Eq. 215,* the jurisdiction was reasserted and exercised. These cases and others cited in them demonstrate the right of the English courts of equity to administer relief in cases like the present.

This jurisdiction is fully recognized by writers on equity jurisprudence. Thus *1 Story Eq. 195:*

"With the exception of wills, the courts of equity may be said to possess a general, and perhaps a universal, concurrent jurisdiction with courts of law in cases of fraud cognizable in the latter, and exclusive jurisdiction in cases of fraud beyond the reach of the courts of law. The jurisdiction in matters of fraud is probably coeval with the existence of the court of chancery."

And Professor Pomeroy (*2 Pom. Eq. Jur.* § *912*) asserts that

"the [English] doctrine is fully settled by an unbroken line of decisions extending to the present day; that with one remarkable exception [fraudulent wills], the jurisdiction of equity exists in and may be extended over *every* case of fraud, whether the primary rights of the parties are legal or equitable, and whether the remedies sought are equitable or simply pecuniary recoveries, and even though courts of law have a concurrent jurisdiction of the case and can administer the same kind of relief. * * * The only question, therefore, presented to an English court is not whether the equitable jurisdiction exists, but whether it should be exercised."

Undoubtedly the American courts have not generally upheld so broad a jurisdiction, being influenced probably, and sometimes controlled, by enactments similar to the United States Judiciary act of 1789, which declared that "suits in equity shall not be sustained in either of the courts of the United States in any case where a plain, adequate and complete remedy may be had at law." But New Jersey is distinguished from her sister states by her adherence to the standards of the mother country respecting both rights and remedies in equity, and I know of no constitutional or statutory provision or judicial decision in this state which can be regarded as withholding or withdrawing from our court of chancery any jurisdiction possessed by its English prototype. True the jurisdiction of equity, in cases of fraud remediable at law, has not been much invoked, but that may be accounted for, in large degree, by the less expensive, equally efficient and in former times more speedy, remedy secured in the courts of law. When resorted to, however, the jurisdiction of equity has not been doubted. Thus, in *Winans* v. *Winans, 4 C. E. Gr. 220,* where the complainant claimed that the defendant, by fraudulent representations concerning the encumbrances on land sold by the complainant to the defendant, had induced the former to refrain from demanding before conveyance a part of the price agreed upon, and the prayer was that the defendant should be

decreed to pay the money thus fraudulently retained, the cause was argued by the present chancellor for the complainant and by a former chancellor for the defendant, without question as to the jurisdiction, and a decree for the complainant was put by Chancellor Zabriskie distinctly on the ground of fraud in the non-payment of the price, and was to the effect that the defendant should pay the same. For such a remedy the courts of law would have been equally available.

The generality of the jurisdiction, as well as the limited scope in which courts of equity are disposed to exercise it, is indicated by the case of *Krueger* v. *Armitage, 13 Dick. Ch. Rep. 357,* where a bill to recover damages on a fraudulent sale of stock was demurred to for want of jurisdiction, and Vice-Chancellor Emery said: "In support of the jurisdiction the *settled rule* is relied on that equity has jurisdiction concurrent with law in cases of fraud." But he held that in the case before him the jurisdiction should not be exercised, because it had been challenged *in limine,* and the assessment of damages could be made as well by a jury as by the court. This case was followed in *Polhemus* v. *Holland Trust Co., 14 Dick. Ch. Rep. 93; on appeal, 16 Dick. Ch. Rep. 654,* where the complainant's claim was of like character, and Mr. Justice Collins, delivering the opinion of this court, expressly approved the doctrine declared as above by the learned vice-chancellor, accompanying his approval, however, with the unsupported statement that "for the recovery of damages the exclusive remedy in this state lies with the law courts."

In the case now pending the defendants have not questioned the jurisdiction of the court or objected to its exercise, and the court of chancery has exercised its jurisdiction; the claim of the complainants, as we maintain it, is for cash and goods furnished, the value of which is ascertainable as readily by a master as by a jury, and the fact that many small items are probably to be taken into account makes the master's office an apter place for getting at the truth.

We are therefore of opinion that the cause should be retained for the purpose of enabling the complainants to secure a decree requiring the executor to pay out of the estate such sum as will

recompense them for the money and property which they were induced to furnish to and for Mrs. Stager because of her fraudulent pretence of poverty. As the testimony heretofore taken was not presented with this end clearly in view, the parties should have an opportunity to offer fuller proof respecting that matter, and for that purpose the decree should be reversed and the cause remitted to the court of chancery for further proceedings in accordance with this opinion.

*For reversal*—VAN SYCKEL, DIXON, GARRISON, GUMMERE, COLLINS, FORT, HENDRICKSON, BOGERT, VREDENBURGH, VOORHEES, VROOM—11.

*For affirmance*—ADAMS—1.