DAVID S. FORMAN and HARRY FORMAN, complainants-respondents,

*v.*

GRANT LUNCH CORPORATION, defendant-appellant.

[Submitted February term, 1933. Decided April 28th, 1933.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Backes, who filed the following opinon:

"The bills are to reform a covenant or to annul it, and to restrain an action at law to enforce it.

"Metropolitan Lumber Company owned land facing sixty feet on Market street, Newark. On December 6th, 1927, the company leased the easterly twenty-six feet to Grant Lunch Corporation; the most easterly sixteen feet for twenty years, beginning March 1st, 1929, and the adjoining ten feet for ten years, beginning March 1st, 1939, at the expiration of an existing lease held by one Rosenstrauch. The company agreed to erect a one-story store building on the twenty-six feet according to plans and to have the store of the Grant Lunch Corporation ready for occupancy March 1st, 1929. Eight thousand dollars advance rent was paid. It was stipulated that, if the store was not ready for occupancy March

1st, 1929, the lessee's obligation should be at an end and the $8,000 should be repaid.

"Metropolitan Lumber Company sold the property (sixty by one hundred) to Harry and David S. Forman for $595,000 on August 29th, 1928. The company agreed to complete the building and the title was to close March 1st, 1929. The Fidelity Union Title and Mortgage Guaranty Company agreed to lend the Formans $375,000 on bond and first mortgage on the property, and Grant Lunch Corporation agreed to subordinate its lease to the Fidelity Union Title and Mortgage Guaranty Company mortgage.

"Metropolitan Lumber Company was unable to convey to the Formans because tax, mortgage and judgment liens on the property exceeded the purchase price, which it was unable to discharge. Later a receiver in insolvency was appointed for Metropolitan Lumber Company. Under mortgage foreclosure the property was sold, February 13th, 1930, at a price in excess of the Formans' purchase price.

"When the subordination deed of Grant Lunch Corporation to the Fidelity Union Title and Mortgage Guaranty Company was delivered to the Formans, the Formans gave Grant Lunch Corporation an agreement which recited the existence of the Grant Lunch Corporation lease, that the Formans were about to acquire the property and to give the $375,000 Fidelity Union Company mortgage and witnesseth:

"'1. The parties of the first part (Formans), in order to induce the said party of the second part (Grant Lunch Corporation), to execute the "subordination of lease" hereinafter mentioned, hereby, jointly and severally, agree to and with Grant Lunch Corporation, a corporation, that upon the execution by the party of the second part of the "subordination of lease," referred to in paragraph 2 hereof, they, the said David S. Forman and Harry Forman shall henceforth be, become and remain, jointly and severally, liable, obligated and bound to Grant Lunch Corporation, a corporation, for the payment or repayment of such sum or sums as Metropolitan Lumber Company, a corporation, is, or may become, obliged to pay or repay to Grant Lunch Corporation, a corporation, under the provisions of the aforesaid lease recorded in the office of the Register of Essex County, in Book H 77 of Deeds for said county, at pages 541-549, and particularly for the payment and/or repayment of eight thousand dollars (8,000), said sum of eight thousand dollars (8,000) being the

security which is now held by Metropolitan Lumber Company, a corporation, heretofore received by it from the Grant Lunch Corporation, a corporation, pursuant to the provisions of the aforesaid lease. It is expressly understood and agreed between the parties heretofore that the obligation for the payment and/or repayment of the sums above referred to shall be, and hereby is, constituted an encumbrance and charge against the premises described in deed recorded in the office of the Register of Essex County, in Book O 66 of Deeds for said county, at page 165, &c., and that such encumbrance and charge shall be, and remain, inferior only to the first mortgage above to be placed on the premises above described in the sum of three hundred and seventy-five thousand dollars ($375,000) and to be held by Fidelity Union Title and Mortgage Guaranty Company. Said encumbrance and charge hereby created is to be discharged and to be null and void only when the sums above referred to are paid or repaid to Grant Lunch Corporation, a corporation, in accordance with the lease herein referred to and in accordance with the provisions of this agreement." '

"Metropolitan Lumber Company, having defaulted, Grant Lunch Corporation, in December, 1929, brought suit in the supreme court against the Formans to recover the $8,000 advanced to Metropolitan Lumber Company, whereupon the Formans filed this bill alleging, in substance, that their agreement with Grant Lunch Corporation was that it would postpone its lease to the $375,000 mortgage, and that they [the Formans] would, upon getting in the title, repay the $8,000; that the agreement as first reduced to writing so provided; that there was no agreement that they should become responsible upon the mere execution of the deed of subordination, and that the attorney of Grant Lunch Corporation, in redrafting the agreement, fraudulently substituted the absolute promise, and deceitfully procured the Formans to execute it in ignorance of its effect and in the belief that they would not be bound unless they obtained title and the subordination deed became effective; that the subordination deed of Grant Lunch Corporation and their [the Formans'] corresponding agreement to repay the $8,000 were executed and delivered in anticipation of the closing of the title and were contingent upon their acquiring the property, and, the sale having failed, there was no liability.

"The defendant, Grant Lunch Corporation, answers that it refused to sign any instrument of subordination unless the

Formans would enter into a binding agreement to pay the $8,000 which would be due it from Metropolitan Lumber Company if possession were not given to it March 1st, 1929, and that the Formans agreed to become bound for Grant Lunch Corporation 'physically executing the subordination agreement' whether they became the owners of the property or not, and that the agreement to pay expresses the real and only agreement made between the parties. Fraud is denied.

"David S. Forman, lawyer, negotiated the entire deal. He says he applied to the officials of Grant Lunch Corporation, Halprin and Jackowitz, for the subordination of their lease, and that they agreed, Jackowitz expressing eagerness to have the Formans as their landlord instead of Jacobson of the Metropolitan Lumber Company, as they felt more certain that they would get the $8,000 from him if he were the landlord instead of Jacobson, and they referred him to Charles Kanter, their attorney, to prepare the papers. Halprin and Jackowitz deny having any communication with Formans. However that may be, Forman called upon Kanter. Kanter says he was asked by Forman to get the postponement; that he replied he saw no objection and that he would see his clients. He says he saw them and, later, informed Forman: '* * * that the Grant Lunch Corporation would not sign a postponement to the Fidelity mortgage unless he would guarantee, he—Forman and his brother—would guarantee to the Grant Lunch Corporation the $8,000 which they then had theretofore put up with the Metropolitan Lumber Company under the lease. I said, furthermore—told Mr. Forman: "My people are very much disgusted with the whole situation;" that the building was not being erected in accordance with the plans nor was it being erected with such speed as it would be completed by March 1st; that it was essential for my people to have the building on March 1st—the lease so called—provided for. I told him they were very much worried, they didn't want to sign any more papers unless they, Mr. Forman and his brother, would take the responsibility and sign some papers to that effect. He said: "Well, that is

all right;" he says, "we will do that." I said: "Furthermore, Mr. Halprin told me that they are spending so much in the proposition they don't even want to pay any more money for lawyers and if there is any charge for drawing the papers you will have to pay it." He said: "That won't be a million dollars either, will it?" I said: "No." He says: "Go ahead and draw the papers." That was, as I recall it, a few days before February 1st. I drew the papers and I informed Mr. Forman that it was drawn and he came over to look at it. He said: "Well," he said, "this is all right; I will look it over home. If it is all right I will sign it. It looks all right now, and I will arrange for the postponement to be sent over to your office. Will you take care of the execution?" I said: "I will." That was on what date? Either two or three days after January 30th, not more than that. He called me up a day or two after and said: "The paper is all right. Go ahead and have your people sign it." I had my people up at my office on February 8th. That is the date of the instrument, also the date of the acknowledgment. They signed the agreement which Mr. Forman seeks to have reformed, and they also at the same time signed the subordination of lease to the Fidelity Mortgage. Those papers remained with me. I got a call from Mr. Forman, or he came in without a call, on the 19th of February and told me and showed me the executed instrument of guarantee. At that time I gave the original subordination agreement to him and I took the—I gave him our signed copy of the guarantee agreement and he gave me one original signed copy of his original guarantee agreement—gave me receipt for it and that is all there was to it.'

"Forman's understanding of what Kanter's client wanted, as related to him by Kanter, was that they [Formans] should become responsible for the $8,000 when the deal was closed, the mortgage effected and the lease subordinated; and we are impressed that he understood him correctly for he explained to Kanter: 'I am satisfied to be responsible because I am going to get this money from the Metropolitan anyhow.'

He saw no reason for not putting in writing a responsibility that would be his if he became the owner, and Kanter knew what he meant. Kanter's clients' instructions to him, and his conception of them, and as he gave Forman to understand, is reflected in Kanter's first draft of the agreement in which he wrote that 'after the title to the premises above described is acquired by the party of the first part (Formans) they shall become jointly and severally liable,' &c. Forman read it; it expressed his understanding; he suggested changes in other respects and Kanter agreed to make them. There manifestly was a unanimity of minds, as of that time, to rewrite the agreement so that there was to be no responsibility unless ownership followed. There were no subsequent negotiations. Kanter's testimony accommodates itself to the situation as it now presents itself, but we are constrained to the belief that there was no intention, during the negotiations, that his clients were to have a guarantee of the payment of $8,000 if the store was not ready by March 1st and they saw fit to withdraw. The circumstances are unmistakable, that it was not and could not have been in his mind at that time, and that it was an after-thought, artfully put to use. Kanter admits that the change in the redraft of the agreement, from a conditional to an absolute liability, was his brother's invention, whom he consulted, who he says had more experience—smarter.

"There is also this indication that the contract as written was the ingenuous contrivance of counsel and not the arrangement of the parties as negotiated by them. Kanter told Forman that his clients were so disgusted with the whole affair 'that they were spending so much in the proposition, they don't even want to pay any more money for lawyers and if there is any charge for drawing the paper you will have to pay it.' Their attitude, obviously, was that they were surrendering rights, for, if it was their thought that the Formans were to assume payment of the $8,000 at all events, would they have been so indifferent?

"As revamped, Forman expressed his satisfaction with the

agreement, took it away to be signed, and later on, the day arranged for the closing, February 19th, 1929, turned it over to Kanter, and got the subordination deed; and Kanter knew of the impending closing and of his purpose. Forman was unsuspecting; the agreement seemed to him to be wholly in accord with the spirit of the transaction and his prospects; its technical language, that upon the 'execution' of the subordination of the lease he was to be bound implied consistency with the arrangement and as it was set down in the original draft and 'execution' meant to him execution in legal effect of the subordination deed, all as Kanter had calculated. He knew that Forman did not intend to commit himself to pay $8,000 for the physical execution of the document which he realized would be but a scrap of paper if it failed of its purpose.

"The provisional covenant, in the agreement, that the $8,000 should be a lien on the land, which could not be unless the Formans acquired the title, was disarming and tended to foster Forman's belief that the delivery of the agreement was conditional upon his getting the property. And so was the taking of a receipt by Kanter for the deed and a copy of the agreement, as Forman was on his way to complete the transaction; it was a continuing suggestion to him, in his state of mind, that the delivery was provisional.

"The defendant's contention that Forman does not say he was misled by the language of the agreement is literally correct, but is not substantially true. That he was deceived inheres throughout his testimony and it finds support in the story told by Kanter.

"We have no difficulty in finding that, from the inception to the finish, Forman was minded, born of his arrangement with Kanter and assured by the original draft of the agreement, that he was to be bound only and when he came into the title, and that the exchange of documents was tentative, to accomplish that end, and Kanter was aware of this.

"Halprin and Jackowitz, officers of Grant Lunch Corporation, now maintain that they executed the subordination

deed upon the assurance of Kanter that the Formans would be immediately bound to repay them the $8,000. We have no reason to doubt that he so advised them after the redraft of the agreement to that effect, but it is outstanding that that was not their arrangement with Forman; and they knew. Now, let it be that, after the arrangement, Kanter aimed to secure the $8,000 if the Metropolitan Lumber Company defaulted, and sought this advantage for his client by reconstructing the agreement from a provisional into an instant obligation, which was his right, it became Kanter's duty, knowing Forman's state of mind, to call his attention to his changed attitude, the change in the effect of the agreement and the consequences if he exchanged it tentatively from the subordination agreement. Instead, he silently indulged Forman's misconception and let him fall into the trap; therein lies the fraud. The familiar principle upon which equity grants relief in such circumstances is to be found in *Lloyd* v. *Hulich, 69 N. J. Eq. 784; Chelsea National Bank* v. *Smith, 74 N. J. Eq. 275; Lionel C. Simpson Plumbing and Heating Co.* v. *Geschke, 76 N. J. Eq. 475; Zarecki* v. *Guarantee Realty Co., 82 N. J. Eq. 489.* Kanter's explanation or excuse for his silence is, in substance, that he was dealing with a lawyer and that he knew or should have known without being told, the legal effect of the agreement. In the abstract the argument is plausible, and if Kanter and Forman were antagonists, then the gain to the victor. But equity does not tolerate surreptitious advantage, even between lawyers. Kanter, with his clients' consent, was in the pay of Forman, and, while the relation was perhaps not one of attorney and client, it was one of trust and confidence, at least, to the extent that Kanter would deal fairly and frankly, and Forman had faith in him, of which he was not unmindful, Mr. Pomeroy in his classification of confidential relation says:

" 'The second class embraces those instances in which * * * it appears that either one or each of the parties, in entering into the contract or other transaction, expressly reposes a trust and confidence in the other; or else from the

circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence in the particular case is necessarily implied. The nature of the transaction is not the test in this class. Each case must depend upon its own circumstances. The trust and confidence and the consequent duty to disclose, may expressly appear by the very language of the parties, or they may be necessarily implied from their acts and other circumstances.' *Pom.* § *902.*

"It is no answer, that Forman's training should have equalled Kanter's intrigue. Legal training is not a shield against misplaced confidence; the higher the training the more susceptible to guile. Equity does not distinguish between the deception of lawyer and layman.

"The defendant argues: Why should Forman put in writing a responsibility which he knew would be his if he became the landlord, and why the writing unless he understood he was taking on the additional responsibility of repaying the $8,000, if the Metropolitan Lumber Company defaulted in not having the store ready by March 1st? Forman gave the answer to Kanter: 'I am satisfied to be responsible because I am going to get this money from the Metropolitan anyhow.' He could get it only, as Kanter must have understood, if he got title, and this was at the time when the arrangement was, as recorded in the first draft of the agreement, that the responsibility should come into being 'after the title to the premises * * * is acquired.' The fraud came later.

"It is set up that the complainants are in laches; that they made no denial of liability and, consequently it, the defendant, took no action to protect itself against the Metropolitan Lumber Company, which has since become defunct. The legal responses are: An estoppel does not arise upon one's own fraudulent conduct, and the complainants were not required to meet the charge until they were brought into court. The factual answer, however, is: After Kanter gave Forman the deed of subordination to be used in closing the title, which transaction came to naught, Forman was still hopeful

and so was Kanter, and thereafter the two negotiated for a lease to Grant Lunch Corporation of the adjoining store of Rosenstrauch. They arranged to buy off Rosenstrauch for $5,000; Grant Lunch Corporation to contribute $2,000, Forman the balance. This was after March 20th, 1929, for on that day Rosenstrauch agreed to vacate. Forman, after that and up to the sale in February, 1930, did not abandon hope, and at the master's sale, he bid $8,000 in excess of his contract price to get the property.".

*Mr. Merritt Lane,* for the appellant.

*Messrs. Lum, Tamblyn & Colyer* (*Mr. Ralph E. Lum* and *Mr. Chester W. Fairlie,* of counsel), for the respondents.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons expressed in the opinion delivered by Vice-Chancellor Backes in the court of chancery.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, LLOYD, CASE, BODINE, DONGES, HEHER, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, DILL, JJ. 14.

*For reversal*—None.