On, or prior to, April 16th, 1937, the complainant and her late husband, Frank A. Jaeggi, now deceased, owned two *Page 156 
parcels of real estate, one in Lodi, New Jersey, which was unimproved and unencumbered, and the other, in Tenafly, New Jersey, which contained a dwelling, encumbered by a mortgage for $3,400.
Sometime during that month, there appeared in the BergenEvening Record, a newspaper published in the city of Hackensack, county of Bergen, State of New Jersey, the following advertisement:
"Homes — Built to your order, brick, stone, frame, 6 rooms, bath, complete. Every up to date convenience $4,500. Credit allowed on your old home. Financing arranged. BUILDERS, 310 Main Street, Room 307, Hackensack 3-2221."
The defendant caused the publication of the advertisement. The complainant and her husband noticed it, and, consequently, communicated with the defendant. In response, he called at their home. Arrangements were then made for the construction of a house on their Lodi property. The Jaeggis lacking funds, it was agreed that the defendant would take their Tenafly dwelling as a part payment for the cost of the new one (Exhibit C-4). The defendant demanded, and received from them the sum of $100, which he said was to meet the costs and expenses of plans and specifications for the proposed new house. The defendant, subsequently, brought to the Jaeggis plans and specifications, prepared by his son, who is not a licensed architect. They appeared to be satisfactory. The defendant and complainant's husband signed a written instrument (Exhibit D-3) which the defendant presented; it acknowledges the receipt of the $100 for the cost of the plans and specifications.
Then, the complainant and her husband, and the defendant, proceeded to Lodi and inspected the Jaeggis' property. The defendant then told them that it was a "beautiful spot," and assured them there would be no trouble in raising a mortgage to cover the balance of the cost of construction.
On the night of April 26th, 1937, the defendant called upon the Jaeggis. He then produced two forms of contract; one was for the construction of the new home at a price of $5,600; *Page 157 
$600 of which was to be paid upon the signing thereof (ExhibitC-3); the other was for the sale of their Tenafly home (ExhibitC-4), to him, at a price of $4,200. He requested the Jaeggis to sign both contracts immediately. They hesitated and sought delay in order to weigh and deliberate upon the contents of the proposed agreements. Andrews insisted that the papers be signed that night, and his persuasions prevailed. Before the execution of the contracts, the complainant observing that, under the terms of the building contract, that $2,000 was to be paid upon the enclosure of the building, and the sum of $1,500 when the plastering therein was finished, and the balance, of $1,500, upon the completion of the building, told Andrews that she and her husband were financially unable to make such payments. He replied that they were in accordance with the usual terms of building contracts, and that there was no reason for worry inasmuch as he was going to obtain the loan for them. Relying upon his statements and representations, the complainant and her husband then signed the contracts (Exhibits C-3 and C-4), and gave him the "down payment" of $600. In Exhibit C-3 the following appears:
"It is further herein understood and agreed that the party of the first part will execute a mortgage to some bank or mortgage co. for the amount necessary to pay up the construction of the building complete above any and all cash payed to the builder on this contract or that may later be paid to the builder."
Under the agreement by which Andrews was to take title to the Tenafly property (Exhibit C-4), he was to assume the payment of the bond and mortgage of $3,400 which encumbered it, held by a building and loan association in New York City. The complainant testified to the effect that before the contracts (Exhibits C-3
and C-4) were signed, it was agreed that she and her husband were to remain in possession of the Tenafly property, rent free, until the new house was ready for occupation. The contract (Exhibit C-3) called for the completion of the new house by September 1st, 1937.
Andrews proceeded with the construction of the building. He evinced no activity in the effort to procure the loan for it. *Page 158 
The Jaeggis demanded performance, and in July, 1937, he admitted to them that he could not obtain the loan from the sources that he had counted upon. He then said he would apply to the Federal Housing Administration (F.H.A.) for a loan. During the conversation, he informed them that to successfully negotiate such loan, it would be necessary for them to first divest themselves of their title to the Tenafly property and convey it to him by deed, asserting as a reason therefor, that it was contrary to the policy of the F.H.A. to advance loans to people who had other property. He later submitted an F.H.A. loan application and also a form of deed conveying the title of the Jaeggis' Tenafly property to him. The Jaeggis demurred to the signing of the papers and said they would seek the advice of a lawyer. He said there was no need to do so. His apparent sincerity and persuasive manner won them over. They signed the application and the deed. Approximately one week later, Andrews again called at the Jaeggi home and said that in order to file the F.H.A. application, a $50 deposit must accompany it. The complainant refused to give him that sum, and declared she would file the papers. She then demanded and obtained from him the loan application. She, thereafter, filed it with the Lodi Trust Company.
The work on the house construction proceeded slowly during the summer of 1937. The Jaeggis complained about it and urged more speed. The defendant said its progress could be accelerated by additional payments. The Jaeggis then gave him sums of $200 and $300, respectively, and, also, promissory notes totaling $3,700.
In August, 1937, Andrews demanded that the Jaeggis pay him a monthly rental for the Tenafly house. He said he would apply it to the monthly dues of the building and loan mortgage covering that property. The complainant said that in view of his representations, and despite the agreement that they were to occupy the Tenafly home rent free, until the new home was ready for occupancy, and for the sake of "peace," hoping it would move Andrews to complete the building of the new house, she gave way "to her rights" and paid him as *Page 159 
rental, $40 in August, $40 in September, and $40 in October. Andrews, at first, demanded $50 a month, but upon complainant's statement that $50 was in excess of the amount of the monthly installment due the building and loan, he accepted $40 a month.
On September 20th, 1937, Andrews wrote the complainant that he was forwarding the monthly installments to the building and loan association (Exhibit C-5).
The additional payments of $200 and $300 and the alleged rental payments, do not appear to have speeded the movements of Andrews. The building was not completed on the agreed date of September 1st, or upon any other date; it still awaits completion.
On, or about, October 14th, 1937, the complainant's husband vigorously protested to the defendant about his procrastinating tactics. During the course of the protest Andrews told him it was because of the lack of finances and the difficulty of obtaining a mortgage loan; and if a mortgage were not obtained through outside sources, he would then advance the necessary funds himself. He said he had several thousand dollars in the bank and would be glad to make the investment. A short time later, in a telephone conversation, he said he would advance the mortgage loan. With that purpose in view, he agreed to be at the Jaeggi home on the evening of October 14th. He did not appear at the designated time, whereupon Mr., or Mrs., Jaeggi reached him by telephone at his home that same night. In the telephone conversation, he said he could not keep the appointment. The Jaeggis insisted upon settling the matter that night. They then went to Andrews' home, in Glen Rock. An agreement (ExhibitC-6), for the mortgage loan was there prepared, signed and acknowledged by the defendant. It provides that Andrews would accept a mortgage of $3,700 on the Lodi property, to be payable in installments of one per cent. per month for interest and amortization of principal over a period of five years from its date, October 18th, 1937, and, further, that Andrews would finish the construction of the new building on November 15th, 1937. Andrews charged the Jaeggis *Page 160 
the sum of $125 for the mortgage. On October 18th, 1937, Andrews' attorney prepared a bond and mortgage in accordance with the last mentioned agreement (Exhibit C-6), which were executed by the complainant and her husband at their home in Tenafly that same day (Exhibits D-1 and D-2).
Andrews' agreement to complete the building by November 15th, 1937 (Exhibit C-6), like his previous promises to complete, still awaits performance.
On November 15th, 1937, the complainant's husband, Frank A. Jaeggi, died intestate, and she was appointed administratrix of his estate. Shortly after his death, Andrews instituted proceedings in the district court, in Hackensack, Bergen county, to dispossess the complainant from her Tenafly home. The summons in those proceedings, was served by posting the same upon the door of her home while she was temporarily absent following her husband's death — until sometime before the Christmas holidays in 1937. She was unaware of the eviction proceedings, and on December 22d 1937, a default judgment was entered against her. When she found the dispossess summons on her door, she then applied to this court for relief, whereupon the defendant was enjoined from proceeding with the action until the determination of this suit.
The defendant, Andrews, denied that he had agreed to raise a construction loan. His denial does not find support in his advertisement in the Bergen Evening Record, which, in part, reads: "Financing arranged, Builders."
Three months after he acquired the title to the Tenafly property, Andrews, on October 23d 1937, executed a contract to sell the premises to Mary Sylsbury (Exhibit D-6).
In his testimony, Andrews admitted that he paid no money for the installment dues to the building and loan association, although his written communication of September 20th, 1937, to the complainant (Exhibit C-5) said that he had. As a result, the building and loan association has instituted foreclosure proceedings under its mortgage.
I am satisfied that the defendant throughout his transactions with the Jaeggis grossly imposed upon their credulity *Page 161 
and deliberately proceeded to strip them of their worldly possessions. Throughout his course of transactions with them, he made no stopping point. He has ruthlessly and with a callousness that shocks the conscience, deprived the Jaeggis of their home and their small "fortune." His line of conduct towards them, from the outset, has been most reprehensible and censurable. Their honest candor was a shining mark for his shafts of duplicity. His outstanding aim seemed to be to outwit the justifiable scruples of two innocent, trusting investors. Not satisfied with appropriating his victims' money and home, he attempted to have the widow complainant ousted from her dwelling, and cast upon the street. His affidavit in the dispossess proceedings against the complainant is false. There was no agreement of letting at the rate of $40 a month made on July 17th, 1937. It was not until August 16th, 1937, that the Jaeggis agreed to pay monthly sums to the defendant. The receipt acknowledging the payment (ExhibitC-11) clearly shows that there was no such agreement prior to August 16th. When shown the receipt for the October rent (Exhibit C-10), the defendant attempted to run to cover by saying that he had made a mistake, and that there was but two months rent due on November 17th. His "mistakes" all appear to have been in his favor and against his dupes. He was somewhat careless in his manner of handling the truth. The sum total of the Jaeggis unfortunate transaction seems to be that the "Jaeggis gave" and "Andrews took."
The mortgage he obtained from the Jaeggis on the Lodi property, he, by way of counter-claim, in the present action, seeks to foreclose. He has subjected the Lodi property to a mechanic's lien of $1,060, and a possible further lien of $700 in favor of the plumbing and heating contractor. He permitted those lien claims to attach to the property, notwithstanding the clause in his agreement (Exhibit C-3), that if the contract were not filed in the office of the clerk of the county, he would obtain releases of mechanic's liens from all persons furnishing labor and material in and about the construction of the Lodi dwelling. He obtained no releases. *Page 162 
The testimony revealed him as being unscrupulous, lacking in moral refinements and unworthy of belief.
In order to complete the Lodi building, it will cost approximately $2,000. The building is about sixty-five per cent. completed; and it will take at least three to four additional weeks of work to make it whole.
In the face of the situation existing in the instant case, it seems hardly necessary to refer to cases supporting the court's conclusion herein; but it may not be amiss to cite a few cases having a bearing on it. Eggers v. Anderson, 63 N.J. Eq. 264;Hubbard v. International Mercantile Agency, 68 N.J. Eq. 434;Schoenfeld v. Winter, 76 N.J. Eq. 511; affirmed, 79 N.J. Eq. 219.
In Gierth v. Fidelity Trust Co. (Court of Errors andAppeals), 93 N.J. Eq. 163, the court said (at p. 166):
"Fraud in equity includes all willful or intentional acts or concealments by which an undue or unconscionable advantage over another is obtained."
On the same page the court said that "where by superior knowledge and misrepresentations a party induces another to make an exorbitant and unconscionable bargain, such conduct justifies the implication of fraud and authorizes a court of conscience to set it aside. Hyer v. Little, 20 N.J. Eq. 448, 460."
In Blau v. Public Service Tire and Rubber Co. (Court ofErrors and Appeals), 90 N.J. Eq. 279, the court said (at p.280):
"The rule is that `a court of equity will rescind a transaction entered into upon the faith of a material representation false, in fact, if the person to whom it was made relied upon it and in consequence suffered injury.' Eibel v. Von Fell, 55 N.J. Eq. 670."
See, also, Prudential Insurance Co. v. Merritt-Chapman Scott Co., 111 N.J. Eq. 166; Brittingham v. Huyler's, 118 N.J. Eq. 352;St. John the Baptist, c., Church v. Gengor, Ibid.467; affirmed, 121 N.J. Eq. 349; Forman v. Grant Lunch Corp.,113 N.J. Eq. 175; Downs v. Jersey Central Power and Light Co.,117 N.J. Eq. 138. *Page 163 
I shall advise an order granting the relief prayed for — in effect, directing that the deed to the Tenafly property, and the bond and mortgage on the Lodi property be surrendered by the defendant to the complainant for cancellation; that the contracts of April 26th and October 14th, 1937, be rescinded; that the dispossess proceedings in the district court be permanently enjoined, and that the defendant repay the moneys which he received from the complainant and her husband, less a reasonable allowance for his labor and materials furnished in the construction of the new building; and that the counter-claim be dismissed.