57 N.J. Super. 418 (1959)
154 A.2d 855
MINNIE HANSEN, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
ADOLPH JANITSCHEK, INDIVIDUALLY, ETC., ET ALS., DEFENDANTS-APPELLANTS AND CROSS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 14, 1959.
Decided October 19, 1959.
*421 Before Judges CONFORD, FOLEY and HALPERN.
Mr. Joseph C. Glavin argued the cause for defendants-appellants and cross-respondents.
Mr. Samuel R. Blaine argued the cause for plaintiff-respondent and cross-appellant (Mr. Louis Auerbacher, Jr., attorney).
The opinion of the court was delivered by HALPERN, J.C.C. (temporarily assigned).
This is an appeal by the defendants from a judgment of the Superior Court (Chancery Division) in favor of the plaintiff Minnie Hansen, and against the defendants Adolph Janitschek, individually and as surviving partner of Rudolph Janitschek, and Adolph Janitschek, co-partners trading as New Jersey Art Foundry, John Janitschek Sons, Props., and Viola Janitschek, as executrix of the estate of Rudolph Janitschek, deceased. Plaintiff cross-appeals from so much of the judgment as denies her counsel fees and the court's allowance of simple interest at the rate of 4% per annum instead of 6% compounded.
The court concluded that plaintiff Minnie Hansen was defrauded by her partners, Rudolph and Adolph Janitschek (they were also her brothers) of her just share in certain partnership real estate. Judgment was rendered in her *422 favor against the defendants for $7,333.33, together with interest thereon at 4% per annum amounting to $3,613.70, making a total of $10,947.03, plus taxed costs.
The defendants contend the court should have granted their motion for a judgment at the end of plaintiff's case, and, in any event, the judgment should be reversed because the trial court's findings and conclusions were against the weight of the evidence. Without reviewing the testimony in detail, it is sufficient to say that the trial judge's ruling on the motion and his ultimate conclusions were fully supported by the record. Briefly stated, the court concluded plaintiff had proved that plaintiff and her brothers were part of a closely knit family group, inclusive of their late father, founder of the family business; plaintiff and her brothers were partners in the ownership of certain realty; plaintiff did not know the contents of the partnership and other agreements; plaintiff conveyed her one-third interest in certain of the partnership realty valued at $26,500 for $1,500 because of her brothers' misrepresentations and fraud in failing to advise her of all the material facts; and that plaintiff was defrauded thereby. Based on these findings the court properly applied the well-settled rule of law that where one party, having superior knowledge, misrepresents material facts to another, or fails to reveal material facts which he is under a duty to reveal, and thereby induces such other party to enter into an unconscionable bargain, such conduct constitutes fraud which will move a court of equity to grant relief. Nicholson v. Janeway, 16 N.J. Eq. 285 (Ch. 1863); Jaeggi v. Andrews, 124 N.J. Eq. 155 (Ch. 1938); Stark v. Reingold, 18 N.J. 251 (1955). This principle of law is applicable even if we assumed no confidential or dominant relationship existed between the parties. Jaeggi v. Andrews, supra; Forman v. Grant Lunch Corporation, 113 N.J. Eq. 175, 182, 183 (E. & A. 1933); but here the partnership relationship itself gave rise to mutual obligations of loyalty and fidelity between the partners. Stark v. Reingold, supra, 18 N.J. at page 261.
*423 The defendants' defense of laches is likewise untenable. While about 11 years elapsed before plaintiff instituted this suit, the court was justified in concluding that plaintiff acted promptly after learning all the facts. Moreover, defendants failed to offer any proof of prejudice. Laches is a defense only if there is delay in enforcing a known right and prejudice has resulted to the other party because of such delay. Mitchell v. Alfred Hofmann, Inc., 48 N.J. Super. 396 (App. Div. 1958), certification denied 26 N.J. 303 (1958); West Jersey Title and Guaranty Co. v. Industrial Trust Co., 27 N.J. 144 (1958). Laches as a defense is not regarded favorably where the parties stand in a confidential relationship. Weisberg v. Koprowski, 17 N.J. 362 (1955). Furthermore, the defendants, having been found guilty of fraud, are estopped from using laches as a defense. Forman v. Grant Lunch Corporation, supra; Gallagher v. New England Mutual Life Ins. Co. of Boston, 19 N.J. 14 (1955).
The defendants argue the court erred in striking the testimony of the attorney, Benjamin E. Gordon, pertaining to statements allegedly made by plaintiff to him in 1947 which were held to be privileged. Gordon's testimony reveals that he knew "* * * the entire Janitschek family for almost 50 years." In his words, "* * * To me all the Janitscheks are the same. * * *" At the time of the trial he represented Adolph Janitschek, the estate of Rudolph Janitschek and the New Jersey Art Foundry, the company originally founded by John Janitschek, father of the parties to this suit. In 1947 he was consulted by plaintiff and her husband in connection with a mortgage loan hereinafter to be discussed; and in 1952 he represented them in the preparation of their last wills and testaments. From his own testimony it is clearly inferable that Gordon was a close friend, and would be considered by the ordinary layman as the "family lawyer" of the Janitschek family.
At the outset it is to be noted that there were two sets of statements allegedly made. The trial court permitted *424 the alleged 1958 statements to go into evidence. The disputed statements of 1947 occurred under the following circumstances: sometime in 1947 the plaintiff went to Gordon's law office for the purpose of engaging his services in obtaining a mortgage on her home. Gordon succeeded in getting one of his clients to advance the moneys; he made the necessary title searches; he drew all the required legal documents to consummate the transaction; and he was paid by plaintiff for his work. It was during the time Gordon was doing this work that plaintiff allegedly made the disputed statements to him pertaining to the title of the property being mortgaged. The defendants offered his testimony as proof on their behalf. The court allowed it into evidence, but after hearing the factual background from both sides, struck it out on the basis that the statements were made by a client to her attorney and were privileged. We agree.
The philosophy of the privileged communication doctrine between attorney and client, as we find it to exist in New Jersey, is best stated in the comment to Rule 210 of the A.L.I. Model Code of Evidence:
"In a society as complicated in structure as ours and governed by laws as complex and detailed as those imposed upon us, expert legal advice is essential. To the furnishing of such advice the fullest freedom and honesty of communication of pertinent facts is a pre-requisite. To induce clients to make such communications, the privilege to prevent their later disclosure is said by courts and commentators to be a necessity. The social good derived from the proper performance of the functions of lawyers acting for their clients is believed to outweigh the harm that may come from the suppression of the evidence in specific cases."
We are in accord with the view that this doctrine, since it results in the exclusion of evidence, is to be strictly limited to the purposes for which it exists. In re Selser, 15 N.J. 393, 405 (1954). Nevertheless, when the facts in a given case warrant it, the rule should be applied because the principle is deeply rooted in our jurisdiction. State v. Toscano, 13 N.J. 418 (1953); Stewart Equipment Co. v. *425 Gallo, 32 N.J. Super. 15 (Law Div. 1954). The rule is one of public policy and should be adhered to even though a party is injured thereby. State v. Krich, 123 N.J.L. 519 (Sup. Ct. 1939). For a full discussion of the problem see proposed Rule 26 in the Report of the Committee on the Revision of the Law of Evidence to the New Jersey Supreme Court, dated May 25, 1955, and the annotation therein contained. See also a discussion of the Selser case, supra, by Professor Lewis Tyree, of Rutgers University School of Law, in 9 Rutgers Law Review 298, wherein he says:
"The sanctity of the confidentiality of the attorney-client relationship emerges unscathed, in fact more cherishable, if anything, for having been so comprehensively re-visited in judicial opinion."
It is argued by defendants that the relationship of attorney and client did not exist between plaintiff and Gordon since he was acting for the lender, and the transaction was a business rather than a legal one within the meaning of the doctrine. We are of the opinion that the circumstances surrounding plaintiff's going to Gordon to obtain a mortgage loan created the attorney-client relationship with its privileged communication cloak.
The doctrine has been stated in various ways. In State v. Loponio, 85 N.J.L. 357, 360 (E. & A. 1913), the court said:
"Where, therefore (enlarging somewhat upon the language of Professor Wigmore), legal advice of any kind is sought from a duly-accredited professional legal advisor in his capacity as such, the communications relevant to that purpose, made in confidence by the client, are at his instance permanently protected from disclosure by himself, or by the legal advisor, or by the agent of either confidentially used to transmit the communications, except the client waives the protection." (Italics mine)
Jones on Evidence (4th ed.), sec. 749, p. 1347, says:
"* * * it is sufficient if the statements have been made in the course of legitimate professional transactions between attorney and client as such, and relate to matters as to which the client has sought the attorney's professional aid or advice * * *."
*426 In 58 Am. Jur., Witnesses, sec. 485, p. 272, the rule is stated thus:
"A communication between attorney and client is protected regardless of the matter about which advice is sought, provided it is a proper matter for professional aid and assistance."
Wigmore on Evidence (3d ed. 1940), sec. 2296, p. 569, states it thus:
"It is not easy to frame a definite test for distinguishing legal from non-legal advice. Where the general purpose concerns legal rights and obligations, a particular incidental transaction would receive protection, though in itself it were merely commercial in nature * * * the most that can be said, by way of generalization, is that a matter committed to a professional legal adviser is prima facie so committed for the sake of the legal advice which may be more or less desirable for some aspect of the matter, and is therefore within the privilege, unless it clearly appears to be lacking in aspects requiring legal advice.
Obviously, much depends upon the circumstances of individual transactions."
Wigmore recognizes that there is a conflict of decisions on this problem and concludes that the ultimate decision rests upon the facts in each case. For decisions closely analogous to the present case he cites Turquand v. Knight, 2 M. & W. 98, 150 Eng. Rep. 685 (Ex. 1836), for the holding that "consultation of an attorney for procuring a loan, held privileged." He also cites Doe v. Watkins, 3 Bing (N.C.) 421, 132 Eng. Rep. 472 (C.P. 1837), for the holding that "communications by a person desiring to obtain a loan and seeking an attorney C., acting for a lender, held privileged; C. was to assist professionally in raising the money for the applicant."
Conversations between client and attorney pertaining to the obtaining of a loan incident to the purchase of real estate have been held privileged. 58 Am. Jur. sec. 480, p. 269. See also Vought's Ex'rs v. Vought, 50 N.J. Eq. 177 (Ch. 1892); Palatini v. Sarian, 15 N.J. Super. 34 (App. Div. 1951).
*427 The doctrine is applicable even though it was the first occasion on which the client sought the advice or aid of the attorney. It is even applicable if the attorney ultimately refuses to act as his attorney. State v. Loponio, supra.
It was the duty of the trial court, in the first instance, to determine whether the relationship existed between plaintiff and Gordon. The opinion of the attorney on the subject is not binding on the court. As stated by the court In re Selser, supra, 15 N.J. at pages 404, 405:
"The final determination of the existence of the privilege, however, rests with the court, * * *."
There is even authority that such a determination by the trial court is conclusive on appeal. 58 Am. Jur. sec. 482, pp. 269, 270. However, we need not go that far. There was ample proof in this case for the trial judge to conclude that plaintiff consulted Gordon as her legal adviser rather than merely as an individual to get her a mortgage loan. Shelley v. Landry, 97 N.H. 27, 79 A.2d 626 (Sup. Ct. 1951). The instant case is one where a prospective borrower goes to her lawyer, in the first instance, for his legal assistance in getting a mortgage loan, as distinguished from the case where a prospective borrower goes to a bank and is referred to the bank's lawyer to consummate the transaction. In the latter case the defendants' argument would be more persuasive.
The remaining grounds for reversal urged by defendants have been considered and found to be without merit.
Plaintiff cross-appeals, seeking to reverse so much of the judgment as allows her only 4% interest per annum on the amount found to be due to her. Plaintiff argues interest should have been compounded at 6% per annum. The cases cited by plaintiff to support her position are inapplicable and clearly distinguishable from the present case. The cited cases are concerned with the mismanagement of trust funds, and in those cases the court, in its discretion, *428 allowed 6% compound interest as punishment of the trustee for his wrongdoing.
The trial judge saw and heard all the parties and their witnesses. He had the opportunity of getting the "feel" of the case and having found fraud to exist exercised his discretion and allowed interest at 4% per annum. The amount of interest allowed depends upon the facts of each case. The court in its sound discretion may allow interest as damages for the detention of a debt; or as punishment for a wrong committed; or to accomplish justice. Jardine Estates, Inc. v. Donna Brook Corporation, 42 N.J. Super. 332 (App. Div. 1956); Hankin v. Hamilton Township Board of Education, 47 N.J. Super. 70 (App. Div. 1957), certification denied 25 N.J. 489 (1957); Consolidated Police and Firemen's Pension Fund Commission v. City of Passaic, 23 N.J. 645 (1957).
The court's decision on such a matter will not be disturbed on appeal unless it was arbitrary and unreasonable. The court's action here was reasonable and is affirmed. See East Ridgelawn Cemetery v. Winne, 11 N.J. 459 (1953).
Plaintiff also cross-appeals from so much of the judgment as denies her request for "counsel fees." Her argument is based on paragraph 14 of the partnership agreement which reads as follows:
"Fourteenth: Any partner who shall violate any of the terms, provisions and conditions of this agreement, shall in addition to being subject to other remedies, liabilities and other obligations herein imposed upon him therefor, keep and save harmless the partnership property and shall also indemnify the other parties from any and all claims, demands and actions which may arise out of, or by reason of such a violation of any of the terms, provisions and conditions hereof."
In effect, she contends that as part of the contemplated damages under the indemnity clause she should be reimbursed for moneys paid her attorney in bringing this suit. At the outset it should be noted that there was no proof offered by plaintiff on this subject. Furthermore, a reading of the contract clearly shows that paragraph 14 is a standard *429 "save harmless" clause and relates to actions by third parties and not to actions between the parties to the indemnity agreement. The disputed clause protects an innocent partner from claims by strangers because of the wrongful acts of another partner. It was never intended to cover such a situation as is presented in the case at bar. Therefore plaintiff is not entitled to be reimbursed for her attorney's fees because of the indemnity clause.
The cases which enforce agreements compelling a defaulting party to pay reasonable attorney's fees, and which are not limited by R.R. 4:55-7, are clearly distinguishable from the present case. See Maryland Credit Finance Corporation v. Reeves, 45 N.J. Super. 205 (App. Div. 1957); Congdon v. Jersey Construction Co., 55 N.J. Super. 571 (App. Div. 1959).
Nor can plaintiff get counsel fees under R.R. 4:55-7, since she clearly does not come within the exceptions contained in the rule.
For the foregoing reasons the decision of the court below is affirmed, in all particulars. Neither side having prevailed on their respective appeals, no costs will be allowed on this appeal.
CONFORD, J.A.D. (dissenting).
In my view, there was error below in striking the testimony of the witness Gordon. The evidence does not sustain the thesis that he was in an attorney-client relationship with Mrs. Hansen when the disputed declarations to him were made, and there was consequently no privilege.
A clear understanding of the issue which divides the court and its significance to the merits of the case requires a fuller reference to the facts. John Janitschek founded the Art Foundry business and was associated with his two sons, Adolph and Rudolph, in running it until he became ill, about 1940, and retired, turning the business over to them. He desired, however, that his daughter, Mrs. Hansen, plaintiff herein, who was then separated from her husband, have *430 a one-third interest in the Tonnele Avenue, Jersey City, real property on which the Art Foundry business was conducted, and in the Lake Street residence wherein he made his home with plaintiff. Being particularly anxious that Mrs. Hansen's husband should have no interest in or claim to the property, he consulted Fiorvanti O. Miniutti, a lawyer, and accepted the latter's advice to have a partnership created to hold the title to these properties, with Mrs. Hansen and his sons as equal one-third partners. Miniutti drew the partnership agreement and it was executed by all the parties. It was Mrs. Hansen's position at the trial, however, that she neither read the agreement nor knew its contents. This was earnestly controverted by defendants. The agreement provided that upon voluntary dissolution, which could be effected at the request of any two partners, there should be an equal division of net assets, except that the proceeds of the sale of the Lake Street property were to go to Mrs. Hansen alone. She also had the right to request the sale of that property at any time and to receive the full proceeds of sale.
Upon the death of John Janitschek in May 1945 Mrs. Hansen became reconciled with her husband, and he resumed cohabitation with her at the Lake Street property, also conducting a business from a shop in the rear. In September 1946 there transpired the transaction which underlies this litigation. The three partners executed and delivered two deeds, one for the Lake Street property to the plaintiff, and the other for the Tonnele Avenue premises to the brothers. In addition, the latter gave her a check for $1,500 (of which she says she was required to refund to them $500 in cash). The plaintiff testified these arrangements were concluded pursuant to her request of the brothers that they settle her interest in the father's estate. Adolph, on the contrary, testified she asked for the deed to the Lake Street property soon after the father's death, explaining that she wanted the title to be "on her name and her husband's name"; that he and Rudolph were reluctant about it because *431 it was contrary to their father's wishes, but after about a year acceded to her request in return for her surrender of her interest in the Tonnele Avenue property for a consideration of $1,500. These deeds were prepared by Mr. Miniutti.
Although called as a witness by the plaintiff, Miniutti significantly testified that before it was drawn he discussed the original partnership agreement in conference with all of the parties and their father and explained it to them again at the time it was executed. His recollection was that plaintiff read it at the time and he was of the opinion she understood it. The whole purpose of the arrangement, he said, was to keep the title out of her name so that her then estranged husband could have no interest in it.
With this background, it will be noted that the transaction of plaintiff with the witness Gordon took place in 1946 or 1947  after the consummation of the real estate distribution complained of by plaintiff in this action. He testified he was a family friend of the Janitscheks for 50 years but had represented only Adolph, Rudolph and the father. It does not appear that he had ever previously represented or acted as legal advisor to Mr. or Mrs. Hansen in any capacity whatever. He testified:
"Q. Did you represent Mr. and Mrs. Hansen at that time, Mr. Gordon? A. I dont know how to characterize that, whether I represented them. They applied to me for a mortgage. They couldn't get one at the Trust Company, and they asked whether I could arrange a mortgage, which I did. * * * I got a client of mine named Anna Bohne to put up money for a mortgage on Lake Street."
In the course of his examination of the Hansen title on behalf of the lender, Gordon became concerned over the fact that the deed to plaintiff had not been joined in by the spouses of the brothers and he requested she show him a copy of the partnership agreement. He asked her whether the property had been used for partnership purposes, a matter he deemed material to the sufficiency of plaintiff's deed. Over objection on the ground of privilege, Gordon *432 was permitted, subject to later reconsideration of the ruling, to testify as follows:
"A. She said that the Janitschek Realty Company was formed because father didn't want her husband, John Hansen, to have any interest in the real estate; otherwise he would have conveyed 59 Lake Street to her direct. She further said that after her father died her husband came back, lived at 59 Lake Street with her and she wanted a deed to that property so that she could convince her husband that she didn't agree with her father on his sharing in her father's estate; and then we talked about transferring her interest . First, I asked her how it was that she got the title and she said for over a year she had been trying to get her brothers to give her the deed to the property and they refused to do it, and then she said that in order to get them to do it she wanted to divide the Janitschek Realty Company property and she took a deed and requested a nominal sum of money for the deed from her to the Janitschek Realty Company to the brothers covering Tonnele Avenue; and I asked her whether she realized she wasn't getting as much out of Tonnele Avenue as she could have gotten if she didn't do that. She said yes, she did, and her family life with her husband was much more important to her than the money involved."
Gordon further testified that the mortgage loan was consummated and later repaid; that he advised his client, the lender, that while he entertained a doubt about the title he thought the risk was worth taking in view of the value of the property, and suggested she do so. On cross-examination he said he received a fee from the plaintiff, but he was not asked and did not specify what it covered.
In rebuttal, plaintiff testified she went to Gordon in 1946 "for a mortgage," but denied the conversation he related or that he had even discussed the partnership title question with her. She said, "He just  he OK'd the mortgage for us."
At the end of the case the trial court held that an attorney-client relationship existed between the witness and the plaintiff and granted her motion to strike the testimony in question. In my judgment this was error. Gordon was not Mrs. Hansen's lawyer at the time and never had been; she was not approaching him for legal advice or representation. Her recourse to him was solely as an intermediary for a loan. He told her he might get her a loan from a client *433 of his. So far as she was concerned he was no different from a loan agent. His subsequent examination of the title and interview with her in reference to it were plainly in performance solely of his duty and obligation to certify the security title to the lender of the money, his client. Had plaintiff applied for a bank loan and the latter's attorney raised the same title question she would presumably have given him the same background information she gave Gordon. No more than it would be held that such an interview is privileged should it be held that the one with Gordon was, unless discussions with old family friends or with loan brokers (whether confidential or not) are to be raised to the status of privileged communications. Plaintiff's payment of the fee, in the absence of any evidence to the contrary, was in accord with the universal custom in this state for the mortgage borrower to pay the lender's attorney's fees for title examination, drafting of instruments and closing. There is no basis for inference in the proofs, and the trial judge did not indicate he drew any, that plaintiff and Gordon contemplated the rendition of legal services of any kind by him to her in connection with the matter of the loan or anything else.
The attorney-client privilege has a well-defined place in our jurisprudence, and where it is properly applicable, must be given as broad a scope as accords with its rationale  safeguarding a client's freedom from apprehension in consulting his legal advisor, assured by removing the risk of disclosure by the attorney, even at the hand of the law. State v. Kociolek, 23 N.J. 400, 415 (1957). Nevertheless, since the privilege results in the exclusion of evidence, the doctrine "runs counter to the fundamental theory of our judicial system that the fullest disclosure of facts will best lead to the truth and ultimately to the triumph of justice." In re Selser, 15 N.J. 393, 405 (1954). It is therefore to be strictly limited to the purposes for which it exists. Ibid., and at pages 406, 407. In Palatini v. Sarian, 15 N.J. Super. 34 (App. Div. 1951), it was held that even where a *434 general relation of client and attorney exists, written or oral communications from the client to the attorney having only to do with the latter's agency to act for the former in a particular matter as an agent or attorney in fact do not come within the privilege. The court quoted with approval (at p. 41) Wigmore's phrasing of the essentials of the privilege as: "(1) Where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose (4) made in confidence (5) by the client * * * [are protected unless waived]," 8 Wigmore on Evidence (3d ed. 1940), § 2292, p. 558. There is, in my view, no basis for finding the presence of any of the first three or the fifth enumerated requisites for the privilege in the instant situation and only a dubious basis for the fourth.
It is the generally recognized rule that the privilege applies only to communications made to the attorney where the "strict relation of attorney and client exists," not where he acts as an agent or an attorney in fact for another. The activity must be "peculiarly within the province of an attorney at law." 58 Am. Jur., Witnesses, § 480, p. 268. It is fairly clear, for example, that when one's attorney is also an accountant, communications by the client concerning matters of accounting are not privileged. See Annotation, 38 A.L.R.2d 670, 671, 672 (1954). In the case at hand, while the completion of the loan transaction by Gordon called for his examination of plaintiff's title, he was not doing this for plaintiff, but only for the lender of the money, to whom he was required to make a certification as to the validity of the title. No legal service for plaintiff was bargained for by her with Gordon nor did her payment of his fee bring him under any obligation to her in regard to the sufficiency or accuracy of his title examination. Neither the letter nor the functional purpose of the attorney-client privilege calls for its application here. On the contrary, it unjustifiably blots out an important probative aid toward solution of the basic factual issue in litigation.
*435 The majority cite the Am. Jur. reference, supra, for the proposition that "conversations between client and attorney pertaining to the obtaining of a loan incident to the purchase of real estate have been held privileged." But the case cited therefor is the English decision of Minter v. Priest, [1929] 1 K.B. 655, wherein the declarant's negotiations with the solicitor were in relation not only to the securing of a loan by the latter but also, as part of the same transaction, his representation of the borrower in the drawing of a contract of purchase and closing title, etc. However, that and the other English cases cited by the majority are distinguishable for the reason that in that country the obtaining of loans for an applicant's use in the purchase of real estate is regarded as "within the ordinary scope of a solicitor's employment" (Minter v. Priest, supra, at page 684). I do not conceive that, absent any other interrelated factor, such as representation of the borrower in connection with the purchase itself, the obtaining of loans for applicants not otherwise being represented by the lawyer is part of the practice of law as understood by the legal profession in this country.
More in accord with our own modern American viewpoint is the case of Turner v. Turner, 123 Ga. 5, 50 S.E. 969 (Sup. Ct. 1905). There the court held not within the privilege communications to an attorney by one to whom the declarant had applied for a mortgage loan. The facts and rationale were thus expounded (50 S.E. at page 971):
"It appeared that Mr. Neel carried on, in connection with the practice of his profession as an attorney, the business of a negotiator of loans; that he was authorized by the company which he represented to receive applications for loans; that these applications were transmitted to the company, and, if the security offered was satisfactory, the loan would be accepted, and the money would be sent to Mr. Neel, who, after deducting such sums as had been agreed upon between him and the applicant for expenses and commissions, would pay over the net proceeds to the applicant. It is clear from the testimony that Mr. Neel bore that relation to the applicant and the loan company which has become so familiar to everyone in this state. He was the agent of the applicant, and not the agent *436 of the lender. But he was expected by the lender, on the acceptance of the application, to see that the applicant had an unincumbered title to the property; and if there were incumbrances it was his duty to see that these incumbrances were removed before any portion of the money was paid over to the applicant. He owed a duty to the applicant as agent to do every act that was legitimate and proper to secure the acceptance of the loan. In the performance of these duties it would become necessary for him to exercise his knowledge and information as an attorney at law; but he was really not employed as an attorney, but simply as an agent, who, on account of the fact that he was also an attorney, might discharge the duty that was owing to the applicant without calling for the services of another person. Really the duties which he was to perform as an attorney were more for the protection of the lender, and, if the relation of attorney and client existed at any stage of the transaction, it would be one rather existing between the attorney and the lender than between the attorney and the applicant. The purpose of the applicant was to secure a loan. The person whom she was seeking was a loan agent, and not an attorney, and Mr. Neel's employment was in the capacity of a loan agent, rather than in that of attorney at law. The fact that in discharging the duty that he owed to the applicant as a loan agent the performance of a duty which could be fulfilled only by an attorney might to some extent be involved, would not make the relation one of attorney and client, rather than that of principal and agent."
This reasoning I regard as fully applicable here. There was no privilege and the testimony should not have been stricken.
Plaintiff argues that defendants waived the ruling here discussed by moving to strike her rebuttal testimony directed to that of Gordon. I cannot agree. The motion was predicated on the court's striking of Gordon's testimony, a procedural step defendants were entitled to take, in the posture of the case at that point, without waiving their appeal from the ruling.
In view of the materiality of the proof excluded to one of the principal factual questions involved on the merits of the case, and the closeness of those issues on the evidence, depending in considerable degree upon plaintiff's credibility, I would reverse and remand for a new trial.